PILLOT, PLAINTIFF AND APPELLANT V. DOMÍNGUEZ ET AL.,
DEFENDANTS AND APPELLEES.

APPEAL from the District Court of Guayama in an Action
of Intervention.

No. 1491.—Decided December 15, 1916.

INTERVENTION—OWNERSHIP—PROCEDURE.—In an action of intervention in own-
ership of real property the fundamental question of who is the owner of
the property attached or about to be sold in execution of some judgment,
should be conclusively decided. The proper time for the parties to establish
their rights in a case of this kind is at the trial of the action of interven-
tion, which should be conducted according to the procedure established by
the Code of Civil Procedure.

ID.—EVIDENCE.—After examining all the evidence in this case as it appears from
the statement of the case approved by the trial judge, it was held that as
the intervenor proved her ownership of the attached house, her action should
be sustained.

The facts are stated in the opinion.

*Mr. F. Cervoni Gely* for the appellant.

*Mr. C. Domínguez Rubio* appeared *pro se.*

Defendants Eugenio Balestier and Josefa Pillot did not
appear.

MR. JUSTICE DEL TORO delivered the opinion of the court.

This is an action of intervention in ownership of real
property. In a certain action of debt which defendant C.
Domínguez Rubio brought against the other defendant, Euge-
nio Balestier, the former attached a town property which
plaintiff Carlota Pillot claims as her own.

The intervenor alleged that in 1890 she purchased the
said property from María Juliana Colón, who had purchased
it in 1888 from Alejandro López, who acquired it from Re-
becca Jimbo in 1884. At the trial she introduced document-
ary and oral evidence in support of her allegations.

The defendants denied that the house belonged to the
intervenor and produced evidence to show that it was the
property of the conjugal partnership composed of defend-
ant Balestier and his wife, Josefa Pillot.

The case was submitted on this issue and the court ren-

dered judgment dismissing the complaint, "reserving to the defendants such right as they may have to claim the ownership of the house." The said judgment, from which the plaintiff took the present appeal, is based on the following findings of fact and conclusions of law:

## "FINDINGS OF FACT.

"1. That the plaintiff and defendants are of age and reside within this judicial district;

"2. That on September 15, 1890, the intervenor, Carlota Pillot, purchased from Juliana Colón a small shingle-roofed frame house, on Cruz Street, Guayama; bounded on the north by property of the purchaser; on the south by the theatre; on the east by property of Adela Tadgreen; and on the west by said Cruz Street, for the sum of $80; that later this house was replaced by another zinc-roofed frame house, worth $600, but the court could not determine from the evidence whether the former house was totally demolished and the present one built, or by whom it was constructed;

"3. That it appears from the evidence that the property attached by plaintiff C. Domínguez Rubio in the action of debt against Eugenio Balestier is not the same property which Carlota Pillot purchased from Juliana Colón;

"4. That the evidence introduced by the parties is so contradictory that the court cannot decide who is the owner of the present house or which of the litigating members of the Pillot family paid for its construction, and is therefore unable to determine who is the true owner of the property.

## "CONCLUSIONS OF LAW.

"1. That the parties have capacity to sue and be sued;

"2. That the intervenor is not entitled to the relief prayed for, since it does not appear from the evidence that she is the owner of the house erected on the lot on which the one she bought was situated, and the court reserves to the parties the right to litigate the ownership of the house in the proper action."

For the correct decision of the present appeal it is necessary to determine the character of the action of intervention in ownership which is now governed in Porto Rico by a special act of its Legislative Assembly. See Compilation of Revised Statutes, etc., 1911, sections 5260 *et seq.*

"Intervention" has been defined by Escriche as "the opposition of a third person in an action between two or more litigants, either by supporting the claim of one of the parties or by interposing his own claim to the exclusion of that of the others." IV Escriche, 1072.

Manresa, who treats the subject more fully in his Commentaries on the Law of Civil Procedure, says:

"*Intervention* is the name given in courts of law to the opposition interposed or claim set up by a third litigant in a suit already pending between other parties, and the person who interposes such a claim is called the intervenor. Our experts called the intervention and the intervenor exclusive when the latter alleged that his right was entitled to preference over that of the other litigants, and auxiliary when the object was to aid or support the claim of either of the parties to the suit. Such distinction is really unnecessary and improper. A third person who has a direct interest in the suit because his right is equal to that of one of the parties may join said party for the purpose of supporting the claim in which he is interested. Such intervenor is properly called an auxiliary, but the action he brings is wrongfully called intervention, for the intervenor's claim is not in conflict with or exclusive of those of the other two litigants. Therefore, the law of procedure does not recognize such distinction between intervention either directly or indirectly, but recognizes only the real and positive distinction of ownership and preferred right as defined by article 1532, both of which belong to the class formerly called exclusive, notwithstanding the fact that article 1543 prescribes that the provisions relating to intervention in proceedings for the execution of judgments are applicable to interventions in any other proceedings for the attachment and sale of property." V Manresa, Law of Civil Procedure, 639–640.

When a radical change was made in our Law of Civil Procedure in 1904 the Legislature prescribed clear and exact rules governing intervention in general (Title IV of the Code of Civil Procedure), and established a special proceeding for cases in which property levied on under execution could be claimed by a third person (section 247 of the said code as enacted in 1904). The said proceeding, which required a jury of six men, was repealed by the Act to provide for

the trial of the right to personal property, approved March 14, 1907, to which we have referred. At first the said act related only to claims of third persons to personal property, but in 1908 (Acts of 1908, p. 83) it was made to include real property by the enactment of section 16(*a*), which governs the present case and reads as follows:

"The claim of a third party to real property shall be initiated by an action brought by the claimant against the persons having interest in the matter, and the trial shall be conducted according to the proceedings in the Code of Civil Procedure; *Provided*, That in third party's actions claiming property of this class, an order for the necessary proceedings directing that the property be sold at public auction may be suspended only by the third party by means of an injunction in accordance with the law defining injunctions, approved March 8, 1906; *and Provided, further,* That the court in which the third party's action is instituted shall have jurisdiction to take cognizance of the injunction."

Therefore, this is a principal action in which the fundamental question of the ownership of the property attached, or about to be sold to satisfy a judgment, should be decided conclusively.

We see by an examination of the judgment appealed from that it dismissed the complaint, but reserves to the defendants (*sic*) such right as they may have to claim the ownership of the house in question. And if we analyze the findings of fact and conclusions of law on which the judgment is based, we shall find that the trial court was convinced that the intervenor was the owner of a certain house which was substituted later by another, but could not determine whether the original house was wholly destroyed and the present house built or by whom it was constructed, and concluded that the intervenor was not entitled to the relief prayed for, for which reason her complaint should be dismissed, reserving to the parties the right to litigate the ownership of the house in the proper action.

It will be seen, therefore, that in rendering the judgment

the court was fully aware that it did not determine the rights of the parties conclusively. To arrive at that the parties were to have another opportunity to put in issue the ownership of the house. In our opinion the court erred in so holding. The proper time for the parties to establish their rights in cases of this kind is at the trial of the action of intervention which, according to the act, should be conducted according to the formalities prescribed by the Code of Civil Procedure.

A simple inspection of the record shows that the pleadings and the evidence in this action are as ample as they could have been in any action although it had been called ejectment instead of intervention.

This being so, how should the appeal be disposed of?

Should we simply reverse the judgment appealed from and remand the case to the court of its origin for a rectification of its omission by determining definitely the rights of the parties in a new trial, or should we, in accordance with the provisions of section 306 of the Code of Civil Procedure, as amended in 1906 (section 5350 of the Compilation of 1911), render the judgment which should have been rendered by the lower court?

We are of the opinion that it is preferable to adopt the latter course. By so doing we shall not delay further the final decision of this action, which was begun in the Municipal Court of Guayama in January, 1915, heard anew in the district court, and finally brought up to this court.

As we have said, the intervenor claims that she is the owner of a certain house attached by one of the defendants in an action of debt brought against the other. The claim of the intervenor having been denied, she, who, according to the statement of the case, is a negress who had been a slave and was born before the city of Guayama was founded, offered in evidence a private document, the signatures to which were admitted to be genuine, showing that in 1890 she purchased a house on Cruz Street; an account current

with Juan Bautista Llinás showing that on July 31, 1900, the plaintiff had a credit of $106 in the hands of Llinás, which the latter paid out in different sums for the purchase of lumber and nails and for wages; and a permit from the Municipal Council of Guayama issued to the plaintiff for the enlargement of a house which she owned on Cruz Street. The intervenor also introduced oral evidence consisting of her own testimony and that of witnesses Juan Bautista Llinás, Carlos Vieta, Luis Texidor, Martina Pillot, Pedro María Morel and Bernardo Pillot.

The intervenor explained how she had purchased the house; how it had been damaged by the San Ciriaco hurricane; how she had ordered its repair and paid the cost herself, and how she gave it to her niece Josefa to live in. Witness Llinás identified the document of purchase and the account current. and explained the items of the latter. Witness Vieta testified to the fact of the death of María Juliana Colón, and witness Texidor identified the permit issued by the council to Carlota to repair, enlarge and roof a house on Cruz Street. Martina Pillot, sister of the intervenor and mother of the wife of defendant Balestier, testified that when Carlota bought the house Pepa Pillot had no house and Carlota said to her, "I am going to give you the house to live in as long as you wish;" that from that time Pepa Pillot has lived in the house; that the house was roofed with shingles when Carlota purchased it, but was unroofed by the hurricane and had to be repaired; that she used to go to the house of Bautista Llinás, where Carlota had funds, for money to pay for the repairs to the house; that several years later she again repaired the house with her money without a cent from Balestier, who. never owned the house. Witness Vieta, a carpenter, repaired the house, making additions to it on two occasions, always for account of the intervenor, who paid him. Witness Morel, a painter, worked on the house before and after the hurricane, having been engaged the first time by Carlota and the second time by Pepa

Pillot. Witness Bernardo Pillot, a carpenter, testified that he knew the house attached as belonging to Eugenio Balestier and worked on it in 1901 for account of Carlota Pillot; that the hurricane threw the house out of plumb and the carpenters leveled and repaired it and made an addition thereto; that in 1909 he added a balcony to it for account of Carlota Pillot.

The foregoing is a summary of the evidence for the intervenor. Let us examine that for defendant C. Domínguez Rubio, an attorney of Guayama, who was the plaintiff in the action of debt, and Eugenio Balestier, the defendant in the said action. Defendant Josefa Pillot, the wife of defendant Balestier, who had a suit for divorce pending against her husband, was called and testified in favor of the intervenor, as we shall see later.

The testimony of defendant Balestier, transcribed literally from the statement of the case, is as follows:

"Husband of Josefa Pillot. Says that the small house referred to in the document formerly belonged to Carlota Pillot. That when he married in 1893 he lived with his wife in a rented house, but afterwards they went to live in that small house and, being desirous of owning his own home, he told his wife one day to ask her aunt if she would care to sell that small house. That Pepa spoke to her aunt, who said she would sell it and that they should pay her two or three dollars monthly. That he divided the house into two or three sections. He added a section to the rear, and in 1903, when he had some money, he tore down the small house and erected the large one. It was then that he built the balcony. Later, in 1909, Manuel Modesto made the other addition, for although he had first engaged Ezequiel Alonso and Carlos Vieta they were so unreliable that he was obliged to give the work to Manuel Modesto. He then employed Puchuco to paint it and paid him. That after he had finished painting it Arturo López went to live in it.

"That he demolished the old house with the consent of Carlota, for the house had been purchased although there was no written title, it being a family matter. That he purchased it by paying two or three dollars monthly. That he arranged for the labor with Ramón

Nazario, who furnished the workmen. That Nazario worked one day the first week, five the second and four the third at $1.25 a day. Benigno Nazario worked four days the second week, four the fourth and four the fifth at $1.25. To questions put by his attorney he answered that he did not ask for a permit to erect the said building, for rather than spend the money he had in some other way he began the said carpentry work and Tatato Vázquez, the acting mayor, came and suspended the work, but witness continued it under a permit from him. That later he rented the house to Arturo López and that he owes nothing to Carlota Pillot. That the house has always been rented. That he has not lived in the house for the last two years, the rent during that time having been paid to Pepa Pillot, his wife, who attended to the renting of it. That neither Carlota nor Martina Pillot contributed a cent to the building of the house.

"Witness testified on cross-examination that he told his wife to see her aunt and find out how much she wanted for the small house and they would pay her the amount little by little. That when he returned from the country he asked his wife about it and she answered that it could be paid for little by little, and he gave her $3 or $3.50. 'Q. Do you know whether Pepa paid that amount to Carlota? A. I believe in her honesty. What I do know is that Carlota did not object to the building of the new house and I know that Pepa gave her the money, for Carlota was pleased when we built the new house.' Witness says that the Puchuco who painted the house is the one who had just testified, and that if he testified that Martina paid him he did not tell the truth. That he has not lived with his wife for two years and she lives with her mother."

Other witnesses for the defendants were Gregorio Burglara, a carpenter, who was engaged in the rebuilding of the house and was paid by defendant Balestier; Benigno Nazario, also a carpenter, who worked under the same conditions as Burglara; Natalio C. Soler, a mason, who was likewise employed by Balestier under similar conditions; Arturo G. López, secretary of the Municipal Court of Guayama, who lived in the house and paid the rent to Balestier to whom he advanced $40 or $50 for the bathroom; Luis Texidor, who explained that the municipal permit introduced in evidence by the intervenor had reference to a house on Cruz

Street, near the market; José Alonso, a carpenter, who tes-
tified that the small house belonging to the intervenor and
worth from $60 to $80 was destroyed by the hurricane and that
later Balestier constructed a larger house worth $700; Ale-
jandro López, original owner of the small house, who tes-
tified that a larger house had taken the place of the smaller
one and that he did not know who had built it, but at times
he had seen Balestier supervising the work which was being
done; and Josefa Pillot, who, according to the statement
of the case, testified as follows:

"Wife of Eugenio Balestier. Defendant Domínguez showed her
her answer to a complaint in a divorce suit brought by her husband,
in which she alleged that during the marriage they acquired a house
on Venegas Street and another on Carreras Street. The attorney
for the plaintiff objected to her testifying about that on the ground
that although Josefa Pillot might so testify it could not prejudice
Carlota Pillot.

"The court overruled the objection. Exception. Asked why she
swore in the answer to the complaint that the house belonged to her
and E. Balestier and now swears that it belongs to Carlota Pillot,
she answered that she had not sworn that the house belonged to
Balestier, for the house acquired during their marriage was a house
on Carreras Street. That if the said statement is sworn to it is a
mistake, for the house in controversy is the property of her aunt,
Carlota Pillot, who gave it to her to live in but not to sell. Asked
who paid the taxes on the house, she said that it was Carlota Pillot,
who always gave the money to pay the same as the house belonged
to Carlota. That Balestier had the property assessed in her name
and that she called his attention to this, notwithstanding which he
declared it in the name of Pepa without her consent."

It also appears from the transcript that on motion of the
defendants the court viewed the property and in analyzing
the evidence refers to the same as follows:

"The court has examined the evidence carefully and has made
an ocular inspection of the house whose ownership is disputed. It
is a house of ordinary size, with a balcony, masonry floor, zinc roof,
several apartments, an addition, kitchen, and bathroom; and from

the view and the evidence the court can reach one conclusion only, namely, that the house attached is not the house which Carlota Pillot purchased in the year 1890, for that was a two-roomed, shingle-roofed house worth about $80 in the former currency. On the lot where the said house was situated the present house has been built. The testimony of the witnesses, who are relatives and friends of the interested parties, is so utterly conflicting and the manner in which some of the witnesses, who were in a better position to know the real facts, testified is so biased that after an impartial consideration of the evidence the court is unable to give any credit thereto. If it were to do so, it would follow that all the parties concerned, a part of the Pillot family and defendant Balestier, paid the cost of construction and invested sums of money in materials therefor. Therefore the court considers that the evidence is insufficient to enable it to decide who is the real owner of the house.''

No doubt exists as to the origin of the house. All agree that it belonged to the intervenor.

As to whether the original house was entirely demolished and replaced by the present one or whether it was gradually changed and added to, and, in either case, as to who paid for the new building or the transformation of the old one, the evidence is conflicting. The trial court did not really adjust the conflict, and, therefore, the jurisprudence which has been repeatedly established in regard to conflicting evidence is not applicable to the present case.

We are of the opinion that the balance inclines to the side of the intervenor. If we consider her evidence apart, it is sufficient to establish the ownership of the house in question. It shows that the intervenor acquired the house by purchase. It is admitted that the house was damaged by the San Ciriaco hurricane, but it is proved, not only by the testimony of witnesses, but also by an account current showing the investment of more than $100 in material and labor, that it was repaired. The said account contains items for other repairs made later. A witness, a carpenter, testifies that in 1909 he constructed a balcony for account of the plaintiff.

The testimony of defendant Balestier regarding the pur- chase of the original house from the plaintiff is so vague that it cannot support a finding that the existence of the contract was proved. It is the only evidence as to this mate- rial point and does not even contain any accurate informa- tion regarding the total purchase price.

That defendant Balestier made some repairs to the house and paid for them with his own money is compatible with the plaintiff's ownership of the house. The plaintiff, accord- ing to one of the witnesses, "out of kindness of heart gave a place to live in" to her niece, who was the wife of defend- ant Balestier. It seems that friendly family relations con- tinued for a long time, and it is not strange that Balestier, who paid no rent for the house in which he lived, should improve it from time to time. Perhaps he and his wife had well-founded hopes that the house would eventually become her own exclusive property. But the matrimonial harmony was disturbed and upon the filing of a suit for divorce be- tween Balestier and his wife, an action of debt was brought against the former and the house was attached to secure the effectiveness of the judgment which might be rendered in the said action, and, considered as a whole, all of these facts seem to us to favor the plaintiff.

It is difficult to adjust conflicts of this character, but, moved by a desire to administer justice in so far, of course, as the limits of human intelligence permit, we are of the opinion that the balance should incline to the side of the plaintiff and that her complaint should be sustained, with- out special imposition of costs.

*Reversed and substituted.*

Chief Justice Hernández and Justices Wolf, Aldrey and Hutchison concurred.